**Patricia ARNOLD, Individually and as Executrix of the Estate of Kenneth Arnold, Deceased, Plaintiff,**

v.

**DOW CHEMICAL COMPANY, Defendant.**

**No. CV 94–3803(ADS).**

United States District Court, E.D. New York.

Jan. 15, 1999.

Baron & Budd, P.C., New York City (Fred Baron, Roberta E. Ashkin, of counsel), for plaintiff.

Jacob, Medinger & Finnegan, LLP, New York City (Glenn J. Pogust, of counsel), for defendant.

### MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

Patricia Arnold (the "plaintiff"), alleges that her former husband, Kenneth Arnold ("Arnold") was exposed to high levels of trichlorethethylene ("TCE") during his employment at the Grumman Aerospace Plant in Bethpage, New York, and that this exposure substantially contributed to his development of multiple myeloma, which eventually caused his death on July 16, 1995. In support of

these allegations, the plaintiff has proffered the testimony of four persons as expert witnesses: (1) Dr. Michael Ellenbecker, an industrial hygienist; (2) Dr. Richard Clapp, an epidemiologist; (3) Dr. David Ozonoff, a toxicologist; and (4) Dr. Brian Durie, a hematologist.

All four of the proffered experts have been deposed by Dow Chemical Company (the "defendant" or "Dow") and discovery has been completed. The case is ready for trial. Presently before the Court is the motion by Dow, pursuant to Federal Rules of Evidence 104(a) and 702, seeking an Order excluding the testimony of the plaintiff's proffered experts.

In addition, the Court will address the plaintiff's "appeal" from and objection to the December 19, 1997 discovery Order of the United States Magistrate's Judge Michael L. Orenstein, requiring the plaintiff to pay the cost of their experts depositions, although requested by Dow.

## I. BACKGROUND

Unless otherwise stated, the facts underlying the plaintiff's claims are undisputed. Arnold worked for Grumman Aerospace Plant ("Grumman") in Bethpage, New York from approximately 1963 to 1970 and again from 1972 until 1991. From approximately 1976 until 1991, Arnold worked in Plant 12 at Grumman's Bethpage facility. One of his primary duties was using solvents to clean and degrease the equipment. On April 18, 1991, Arnold first became sick after a minor accident at work in which he bumped his shin on a metal stairway. Shortly thereafter, Arnold was hospitalized due to a resulting infection, and was diagnosed with pyoderma gangrenosum. Arnold's treating physician, Dr. Mae Hultin later diagnosed his condition as multiple myeloma. As a result of this diagnosis, Arnold filed a claim with the New York State Worker's Compensation Board against Grumman in which he sought Worker's Compensation benefits. As part of that proceeding, Arnold was deposed on October 18, 1994.

This action was commenced on July 28, 1994 in the Supreme Court of the State of New York, Suffolk County, and was removed to this Court on the basis of diversity juris-

diction in August 1994. In early 1995, the Court and Dow were advised that Arnold was "in extremis" and requested that his deposition be taken immediately. Arnold was deposed on May 4, 1995 and May 18, 1995. His deposition was then delayed for medical reasons, but was continued on July 6, 1995. On July 16, 1995, at age 53, Arnold died from complications of multiple myeloma. On February 13, 1996 an amended complaint was filed naming Patricia Arnold individually and as Executrix of the estate of her deceased husband, Kenneth Arnold.

As stated above, the plaintiff alleges that Arnold was exposed to high levels of TCE during his employment at Grumman and that this exposure substantially contributed to his development of multiple myeloma, and eventually to his death. In support of this theory, the plaintiff has offered the testimony of the four witnesses who they deem to be experts. As a significant part of the plaintiff's case, the combined testimony of her experts concludes that Arnold was repeatedly and over many years exposed to elevated levels of TCE vapors while working at Grumman; that TCE can be a substantial factor in causing multiple myeloma in exposed individuals such as Arnold; and that TCE was a substantial factor in causing the multiple myeloma and the eventual death of Arnold.

The grounds for Dow's motion to exclude the testimony of all four experts, pursuant to Rules 104(a) and 702 of the Federal Rules of Evidence, is that the proffered expert testimony is not based upon scientific knowledge. Specifically, Dow asserts that:

> the opinions of the experts designated by the plaintiffs as to (1) general causation, (2) specific causation, and (3) exposure to allegedly dangerous levels of TCE solvent are neither reliable nor relevant with respect to the claims asserted by the plaintiffs in this action. As disclosed by these proffered expert witnesses in their reports and the depositions taken in this case, those opinions are not grounded in the methods and procedures of science, and are based upon unfounded assumptions and extrapolations of studies and data that

are irrelevant to the issues that plaintiffs must prove in this action.

The qualifications, substance, and methodology of the four proffered expert witnesses will be discussed in detail below.

## II. DISCUSSION

### A. *Daubert*

Prior to the Supreme Court's interpretation of Rule 702 of the Federal Rules of Evidence in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) ("Daubert") the test to determine if scientific evidence was admissible at trial was whether the evidence was "generally accepted" as reliable within the relevant scientific community. *See Frye v. United States*, 293 F. 1013 (1923). *Daubert*, however, held that the *Frye* test, as it had become known, was superseded by the adoption of the Federal Rules of Evidence.

Rule 702, entitled "Testimony by Experts," states that:

> [i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Examining Rule 702, the Supreme Court in *Daubert* provided a flexible analysis to guide trial courts in determining whether proffered submissions of scientific evidence are admissible. The Supreme Court emphasized the "flexibility" that should guide the trial court when making a determination of the admissibility of scientific evidence and stressed that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 595, 113 S.Ct. 2786 (citation omitted).

■ When faced with an offer of expert scientific testimony, the Supreme Court in *Daubert* stated that

> the trial judge must determine at the outset, pursuant to Rule 104(a) whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier

of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

*Id.* at 592–593, 113 S.Ct. 2786 (citations omitted). The Supreme Court provided a list of factors for a trial court to consider when making this determination, but stressed that "we do not presume to set out a definitive checklist or test." *Id.* at 593, 113 S.Ct. 2786.

The four factors include: (1) whether the theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error in the case of a particular scientific technique; and (4) whether the theory or technique is generally accepted within the relevant scientific community. *Id.; see generally, Zuchowicz v. United States*, 140 F.3d 381 (2d Cir.1998); *Iacobelli Constr., Inc. v. County of Monroe*, 32 F.3d 19 (2d Cir.1994); *Zwillinger v. Garfield Slope Housing Corp.*, 1998 WL 623589 (E.D.N.Y.1998); *Marmol v. Biro Manufacturing Co.*, 1997 WL 88854 (E.D.N.Y.1997).

While the four guidelines enunciated in *Daubert* "leave in place the 'gatekeeper' role of the trial judge in screening such evidence," *General Electric Co. v. Joiner*, 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997), the Second Circuit, in *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038 (2d Cir.1995) held that:

> Trial Judges must exercise sound discretion as gatekeepers of expert testimony under *Daubert*. [The Appellant], however, would elevate them to the role of St. Peter at the gates of heaven, performing a searching inquiry into the depth of an expert witness's soul—separating the saved from the damned. Such an inquiry would inexorably lead to evaluating witness credibility and weight of evidence, the ageless role of the jury.

*Id.* at 1045.

■ In sum, the Federal Rules of Evidence, the Supreme Court's decision in *Dau-*

*bert*, and the principles and guidance of the Second Circuit require this Court, when making a decision as to whether to admit expert testimony to: (1) determine whether the witness is qualified to testify as an expert by examining the witnesses educational or experiential qualifications in the relevant field; and (2) using the four non-exhaustive factors enunciated in *Daubert* as guidelines, determine whether the proposed testimony will involve scientific knowledge that will assist the trier of fact to understand or to determine a fact in issue.

It is within this framework that the Court will exercise its gatekeeper role and address each of the plaintiff's proposed experts in turn. The four expert witnesses offer testimony on two critical issues. First, the plaintiff offers the expert opinions of Dr. Michael Ellenbecker to help establish that Arnold was exposed to hazardous amounts of TCE while performing his duties at the Grumman facility. Second, the plaintiff offers the opinions of three physicians from different specialties to prove that Arnold's multiple myeloma was caused by his excessive exposures to TCE at Grumman.

With regard to all four of the proffered experts, Dow contends that:

their opinions are neither reliable nor relevant with respect to the claims asserted by the plaintiffs and/or the evidence underlying those claims for at least the following reasons:

* There is not one study that reports a statistically significant increased risk of multiple myeloma resulting from exposure to TCE.

* To the extent that any study reports an increased risk of multiple myeloma among members of a particular occupation, those exposures either do not include exposure to TCE, include exposures to multiple substances or include multiple exposures to unknown substances.

* There are no animal studies demonstrating the development of multiple myeloma or any other lymphatic or hematopoietic malignancy in any species, as a result of exposure to TCE.

* There is no evidence that the development of lung, liver or kidney tumors in experimental mice or rats resulting from exposure to [TCE] translates into a risk that a human will develop multiple myeloma.

* Plaintiff's experts have not—and can not [sic]—define a dose or exposure level of TCE necessary to induce multiple myeloma. There is no admissible evidence of the quantity or doses of TCE to which Arnold was exposed.

* There is insufficient evidence of the conditions of Arnold's working environment to calculate the degree to which he was exposed to TCE vapor under any accepted hygiene procedure.

* There is no evidence of the concentration of TCE vapor actually present in Arnold's breathing space during any time of his employment.

* Plaintiff's expert's were requested to provide their opinions solely with respect to Arnold's risk of contracting multiple myeloma as a result of exposure to TCE, even though Arnold used other substances that plaintiffs' own experts believe can also cause multiple myeloma.

* The opinions offered by plaintiff's experts were rendered without any attempt by them to determine the actual degree to which other factors that they believe can cause multiple myeloma contributed to the development of that malignancy in Arnold.

### 1. Dr. Michael Ellenbecker

Dr. Ellenbecker, an industrial hygienist, is Professor of Industrial Hygiene of the Department of Work Environment and Associate Director of the Toxics Use Reduction Institute at the University of Massachusetts in Lowell, Massachusetts. Dr. Ellenbecker concluded "that Mr. Arnold was repeatedly and over many years exposed to elevated levels of TCE vapors while working at the Grumman Corporation."

There is no issue that Dr. Ellenbecker possesses the necessary educational qualifications to testify as an expert. Dr. Ellenbecker received a B.E.E. in 1967 from the University of Minnesota in Electrical Engineering, a M.S. in 1969 from the University of Wisonsin in Electrical Engineering, a M.S.

in 1976 from Harvard University in Environmental Sciences, and a Sc.D. in 1979 from Harvard University in Environmental Health Sciences. The only question, therefore, is whether his reasoning and methodology underlying his proposed testimony is scientifically valid and can properly be applied to the facts at issue. In support of its contention that Dr. Ellenbecker should not be permitted to testify as an expert, Dow asserts that Dr. Ellenbecker was never shown Arnold's Workers' Compensation testimony that reflected that he was exposed to other chemicals in addition to TCE or reviewed other evidence that indicated that Arnold was exposed to various other chemicals.

In addition, Dow claims that Dr. Ellenbecker's opinion is undermined by his reliance on the deposition of Robert Burns, another technician employed in the laboratory where Arnold worked. Burns testified that Arnold, once or twice a week, would check the 500–gallon TCE vat by lifting the lid and looking inside. However, Arnold himself testified that he had only looked inside the tank on a single occasion, at which time he was so overcome that he chastised the man who asked him to do it. Furthermore, in direct contradiction to the testimony of Arnold, Burns claimed that Arnold would physically climb into the vat four to six times a year to scrub down the inside of the vat with a rag soaked with TCE, and that there would be "a gallon or so [of TCE] on the bottom [of the vat]." Finally, Dow contends that Dr. Ellenbecker should not be permitted to testify because he is unable to precisely quantify Arnold's exposure to TCE.

This is a close case. The Court has reviewed the entire deposition of Dr. Ellenbecker as well as his preliminary report dated April 11, 1997 and his updated report dated August 28, 1997. Dr. Ellenbecker's conclusions are based primarily upon the depositions of Arnold and his co-worker Burns. Dr. Ellenbecker did not contact anyone at Grumman, did not make inquiries among the various regulatory agencies to determine whether there was anything in their files regarding Grumman, did not perform computerized research to determine whether there were any reports of any problems or conditions or circumstances that would be relevant to Arnold's exposure, and did not visit the Grumman plant where Arnold worked. In addition, other than the testimony of Arnold and Burns, Dr. Ellenbecker did not have any information regarding the frequencies and quantities of TCE use, the ventilation, if any, in the plant, and the exposure, frequencies, and quantities of other types of materials that may have been toxic, that Grumman was using. Finally, Dr. Ellenbecker was not able to quantify the exact amount of TCE that Arnold was exposed to due to the lack of air sampling and other quantitative information such as the amount of solvent used, the period of time exposed, and the amount of ventilation.

Based on the testimony of Arnold and Burns, his training and experience as an industrial hygienist, and a list of eleven periodical references provided with his April 11, 1997 report, Dr. Ellenbecker concluded "that Mr. Arnold was repeatedly and over many years exposed to elevated levels of TCE vapors while working at the Grumman Corporation."

The Court does have reservations regarding the basis of Dr. Ellenbecker's conclusions. The fact that the conclusions are based primarily upon two lay witnesses whose testimony is inconsistent troubles the Court. In addition, the lack of other evidence such as air sampling, ventilation, and numerical data relating to the exposure, quantities, and frequencies of TCE at the plant undoubtedly diminishes the credibility of the opinion expressed by this expert. At this time, however, the Court finds that despite the problems inherent with Dr. Ellenbecker's testimony, the reasoning and methodology underlying his proposed testimony is, under *Daubert*, scientifically valid and can be applied to the facts at issue. The problems associated with Dr. Ellenbecker's proposed testimony are properly to be resolved by the jury after cross-examination. It is the jury's function to weigh the conclusions of Dr. Ellenbecker in conjunction with the other evidence in the case on this subject, all within the Court's instructions. In the Court's view, the information presented in the depositions provide a sufficient basis for the

Court to permit Dr. Ellenbecker to testify as an expert at the trial. The weight of such testimony is another matter and is for the jury's consideration. Therefore, at this time the Court denies Dow's motion to exclude the testimony of Dr. Ellenbecker, with leave to renew this issue at the appropriate time during the trial.

### 2. Drs. Richard Clapp, David Ozonoff, & Brian Durie

Dr. Richard Clapp, an epidemiologist, is an associate professor in the Department of Environmental Health at the Boston University School of Public Health and a consultant with John Snow, Inc. Dr. Clapp received an A.B. in 1967 from Dartmouth College concentrating on Biology, a M.P.H. in 1974 from Harvard University concentrating on Health Services, and a Sc.D. in 1989 from Boston University in Epidemiology. Dr. Clapp concluded "that TCE can be a substantial factor in causing multiple myeloma in exposed individuals such as Mr. Kenneth Arnold."

Dr. Ozonoff, a toxicologist, is Chair of the Department of Environmental Health at Boston University School of Public Health and Director of the Superfund Basic Research Center at Boston University. Dr. Ozonoff received a B.S. in Mathematics in 1962 from the University of Wisconsin, a M.D. in 1967 from Cornell University Medical College, and a M.P.H. in International Health in 1968 from Johns Hopkins University. Dr. Ozonoff concluded that "exposure to [TCE] was a substantial factor in causing his multiple myeloma resulting in his death."

Dr. Durie, a hematologist, is Chairman of the Board of Directors of the International Myeloma Foudation and Director of Research and Myeloma Programs of the Intercenter Cancer Research Group at Cedars–Sinai Comprehensive Cancer Center. Dr. Durie received a MB and a ChB from the University of Edinburgh Medical School in 1966. In 1969, Dr. Durie was a medical resident at the Wayne State University Medical School, and between 1970 and 1972 he was a clinical and research fellow at the Mayo Clinic and University of Minnesota in the field of Hematology and Hematologic Oncology. Dr. Durie concluded that "expo-

sure to commercial grade TCE solutions ... was a substantial and proximate contributing factor of his multiple myeloma."

▮ Dow claims that Drs. Clapp, Ozonoff, and Durie should not be permitted to testify because their conclusions as to causation have never been tested in any study. Dow submits that both case-control studies and cohort studies attempting to determine the causes of multiple myeloma have not reported a statistically significant association between the occurrence of multiple myeloma and exposure to TCE. Furthermore, Dow asserts that Drs. Clapp, Ozonoff, and Durie should not be permitted to testify because their ultimate conclusion that TCE was a cause of Arnold's death is intrinsically flawed, in that it relies upon the unreliable testimony of Dr. Ellenbecker.

The Court has read the depositions, reports and supplemental reports of Drs. Clapp, Ozonoff, and Durie. While Dow asserts that there is no statistically significant association between the occurrence of multiple myeloma and the exposure to TCE, at this time the Court is of the view that there is sufficient evidence to support the plaintiff's theory so as to permit the expert witnesses to testify at the trial. While Drs. Clapp, Ozonoff and Durie will undoubtedly be challenged on cross examination, including the disputed basis for Dr. Ellenbecker's testimony, and by expert witnesses called by Dow, the proposed testimony of the plaintiff's experts meets the *Daubert* requirements. The testimony underlying the doctors proposed testimony is scientifically valid and can be applied to the facts at issue.

The theory that TCE is a substantial factor in causing multiple myeloma in exposed individuals has apparently been tested and has been subject to peer review and publication. The publications and tests are listed in the reports of Drs. Clapp, Ozonoff, and Durie, which are all part of the Court's record, and thus do not need to be set forth in this opinion. Whether the conclusions of this plaintiff's experts are generally accepted in the scientific community and whether there is a significant potential rate of error in the tests they relied upon, are issues of conten-

tion between the parties and are triable issues for the jury. However, the Court is satisfied that the plaintiff's experts' opinion that TCE is a substantial factor in causing multiple myeloma in exposed individuals meets the flexible requirements set forth in *Daubert*. Ultimately, it will be for the jury to decide what weight, if any, to afford the plaintiff's experts. The Court will not, as a matter of law, based on the present state of the record, prevent the plaintiff's experts from testifying with regard to their opinions, which meet the *Daubert* requirements.

While the Court notes that the ultimate conclusion advanced by the plaintiff's experts that TCE was a substantial factor in causing the death of Arnold would be undermined if the testimony of Dr. Ellenbecker was found to be inadmissible, at this juncture, the Court cannot determine, as a matter of law, to preclude his testimony. Therefore, the Court denies Dow's motion to exclude the testimony of Drs. Clapp, Ozonoff, and Durie, with leave to renew at the appropriate time at the trial.

### B. *Plaintiff's Appeal from Discovery Order*

On February 28, 1997, United States Magistrate Judge Michael L. Orenstein Ordered that the plaintiff pay the cost of the expert depositions of the plaintiff's experts by Dow. More than nine months later, on December 19, 1997, the Plaintiff moved to request that Judge Orenstein reconsider his Order requiring the plaintiff to pay for the depositions of the plaintiff's experts conducted by Dow. Judge Orenstein granted the motion to reconsider, and after reconsideration, adhered to his prior ruling.

██ The plaintiff now appeals from Judge Orenstein's Order and contends that he failed to comply with the provisions of Rule 26(b)(4)(C). Rule 26(b)(4)(C) mandates that the party that requests a deposition pays for the deposition, unless there is a finding of "manifest injustice."

Pursuant to 28 U.S.C. § 636(b)(1)(A), a United States Magistrate Judge's ruling regarding discovery should be set aside only if it is "clearly erroneous or contrary to law."

*Id.* Before discussing Judge Orenstein's Order, the Court finds it appropriate to briefly summarize the discovery proceedings prior to December 19, 1997, in order to place the contested Order in context.

The plaintiff was first directed to serve their expert disclosures by April 12, 1996. After several requests for extensions of time, the first expert disclosure was made on June 7, 1996. Apparently, the disclosure filed on June 7, 1996 did not conform to the Federal Rules of Civil Procedure and Judge Orenstein Ordered the plaintiff to serve new reports by September 5, 1996, and directed that there would be no further extensions of time in this regard. In early February 1997, Baron & Budd, P.C. was substituted as counsel for the plaintiff. On February 28, 1997, the parties appeared for what was intended to be the final pre-trial conference with Judge Orenstein. At this conference, present counsel for the plaintiff, by Roberta E. Ashkin, Esq., requested that discovery be extended in order to add additional expert witnesses. In response, the Court stated:

> [n]ow, the Court extends discovery based upon the following proviso that the plaintiff will pay its own experts who are at the depositions of those experts. Defendant will pay not one red cent for the additional discovery for the plaintiff now reopening discovery and adding experts one year after the date and well after the closing date of discovery in this case.

In response, Ms. Ashkin, on two separate occasions thanked the Court and stated, "I understand Your Honor." It was not until December 19, 1997 that Ms. Ashkin raised an objection to Judge Orenstein's Order.

Given the inordinate delays by the plaintiff in the discovery process; the fact that the plaintiff requested an extension of discovery beyond what was directed to be the final pre-trial conference; and the lack of objections to Judge Orenstein's Order which expressly indicated that the costs associated with deposing the additional witnesses would be paid by the plaintiff, the Court finds that the decision to impose the costs of the defendant conducting depositions of the plaintiff's experts, was clearly not erroneous or contrary to law. On the contrary, the ruling by Judge Orenstein

was appropriate and proper. Therefore, the Court affirms Judge Orenstein's Order of December 19, 1997.

### III. CONCLUSION

Having reviewed the parties' submissions and afforded them the opportunity to present oral argument, it is hereby

**ORDERED**, that Dow's motion pursuant to Rules 104(a) and 702 of the Federal Rules of Evidence, seeking an Order excluding the testimony of the plaintiff's experts, Drs. Ellenbecker, Clapp, Ozonoff, and Durie is **DENIED**, with leave to renew at the appropriate time at trial; and it is further

**ORDERED**, that the plaintiff's appeal from and objection to the Order of the Honorable Michael L. Orenstein dated December 19, 1997 is **DENIED**; and it is further

**ORDERED**, that the parties are to appear for jury selection on February 1, 1999 at 9:00 AM.

**SO ORDERED.**